EXHIBIT 12 part 2

Page 94

1 access to that.
2    Q   Okay. So what would be your procedure when
3 a customer such as this asks you to set up a CashPro
4 account?
5    A   I would either forward that e-mail to our
6 treasury partner and say you need to reach out to
7 Chris. I.M. him let him know, but that would go to
8 the treasury partner and they would set up the
9 CashPro.
10    Q   So clearly Mr. Gowins is asking you to set
11 up an account that you don't have the ability to set
12 up in your department?
13    A   Well, he's saying I will need this company
14 on CashPro; so added to CashPro. Yes. I mean, he's
15 telling me this, and I'm going to get it to the
16 right person because that's the kind of person I am.
17 I'm going to make sure that it's take care of.
18 Clients don't delineate between you're a sales
19 support person and you're treasury because we all
20 work together as a team.
21    Q   Okay, but you're responsible for adhering
22 to certain training procedures and protocols
23 established; correct?
24    A   Correct.
25    Q   Now, if you flip to page 637 it appears as

Page 95

1 though on the same date about an hour later you
2 respond to Mr. Gowins' directly; correct?
3    A   Yes.
4    Q   Okay. You indicate to him that you don't
5 see an attached SS-4; that he has not provided you
6 the articles of incorporation; you also need a
7 signature card resolution attached and filled out
8 prior to opening the account; correct?
9    A   Correct.
10    Q   So at this juncture is it safe to say he
11 has not sent you anything to open up the account?
12    A   (Reading) "I do not see any attached SS-4."
13 Yes, I would say he hasn't sent me anything at
14 10:18.
15    Q   And then at 11:31 he sends you the SS-4
16 form?
17    A   If it's attached, yes.
18    Q   Okay. And that is at August 29, 2011 at
19 11:31?
20    A   Are you waiting for me to say yes? Yes.
21    Q   Okay. Now, included in this e-mail is it
22 safe so say that Mr. Gowins went or represented to
23 you that he would go get Mr. Popovic's signature and
24 bring it back to you?
25    A   Yes.

Page 96

1    MR. SHELY: One thing here. I'm just
2 looking at the document as it's put together, and it
3 appears to me to be two separate although
4 consecutively numbered, two separate e-mails because
5 the --
6    MS. ORTEGA: And I do see that.
7    MR. SHELY: The e-mail starting at 637 is
8 an exchange from August 29, and the e-mail beginning
9 on -- I guess they're both on August 29.
10    MS. ORTEGA: I think and I tried to figure
11 this out, Mr. Shely, and I think what I figured out
12 is the responses contained with different e-mails at
13 different times, but they're all mixed up.
14    MR. SHELY: Maybe that's what it is, yeah.
15    MS. ORTEGA: And that confused me as well.
16 I tried to keep the dates separate by flipping
17 correctly.
18    MR. SHELY: I do see the one on 638 is from
19 the 24th.
20    MS. ORTEGA: Uh-huh.
21    MR. SHELY: And then we go back to the
22 29th, but I'm not sure they're all -- all of it
23 consecutively numbered. I just want the record to
24 reflect that I'm not sure these are all part of one
25 e-mail.

Page 97

1    MS. ORTEGA: And I agree with you. I'll
2 have the record reflect I agree with you, and also I
3 tried to make sure to go in consecutive order all
4 the way through the last time --
5    MR. SHELY: Yeah, that's fine.
6    MS. ORTEGA: -- on August 29.
7    MR. SHELY: I just wanted to note that.
8 BY MS. ORTEGA:
9    Q   Okay. Now, based on your training and
10 experience and what you've learned in all your
11 certification courses is it appropriate to allow Mr.
12 Gowins to go and get Mr. Popovic's signature?
13    A   In business banking, yes.
14    Q   How do you know that Mr. Gowins had
15 authority to act on KARC's behalf?
16    A   Again, this is an established relationship
17 through the client manager who's saying we need to
18 open this being account.
19    Q   And correct me if I'm wrong where in this
20 e-mail does Oswaldo tell you that you need to open
21 this account?
22    A   It could have been a conversation.
23    Q   Okay, but I'm correct in pointing out that
24 on Wednesday, August 24, 2011, at 9:06 Mr. Gowins
25 e-mails you directly stating that you called him and

Page 98

1  that you were going to assist him in opening an
2  account, and he doesn't e-mail Oswaldo; correct?
3    A    That's correct.
4    Q    He e-mails you?
5    A    Correct.
6    Q    And at this juncture you had not met Mr.
7  Gowins?
8    A    That's correct.
9    Q    Okay.  Now, do you know whether or not
10  Mr. Gowins actually went and got Mr. Popovic's
11  signature and Mr. Popovic is the one that executed
12  the signature?
13    A    Well, again, it's a relationship based
14  department.  It's not random people that are in
15  the -- that are within business banking.  So there's
16  a level of a relationship, and I mean, on some
17  accounts we have pages and pages of signors.  This
18  is just the way it's done, and it's cross referenced
19  on a business account.  If he's listed -- if you're
20  asking me whether or not I pulled the other account
21  to verify his signature, I mean, I'm familiar with
22  the signature.
23    Q    Okay.  So let's talk about that.  You're
24  saying whether or not you pulled the other account
25  and looked at the signature.  Why is that -- well,

Page 99

1  is pulling the account, a different account and
2  checking the signature on the signature card a way
3  to verify somebody's identity or see if the
4  signatures appears similar?
5    A    Yes.
6    Q    Is that a way that you can verify?
7    A    Yes.
8    Q    So I want to go over Mr. Popovic's original
9  account.  And I think you had referenced Greyside
10  Group, Inc., correct, when you were --
11    A    Yes.
12    Q    -- talking about Mr. Popovic having a an
13  account with the bank already?
14    A    Yes.
15    Q    You didn't open the Greyside Group Account;
16  correct?
17    A    Correct.
18    Q    But there was a Greyside Group, Inc.,
19  account opened.  We can agree on that?
20    A    Yes.
21    Q    I'm going to show you what we're going to
22  mark as -- may I have that one back only because I
23  don't want to -- we've got one there, and I'm going
24  to put a two at the bottom here.
25        MR. SHELY:  Is she looking at -- whose got

Page 100

1  the originals, the original exhibit numbers?  I do?
2        MS. ORTEGA:  No, she does.  She's looking
3  at the originals.
4        MR. SHELY:  Oh, okay, but are they marked?
5  I don't see where they're marked.
6        MS. ORTEGA:  She doesn't mark them with
7  stickers.  She writes them on the bottom and stamps
8  them.
9        MR. SHELY:  Oh, okay.  That's a shock.
10        MS. ORTEGA:  I asked the same thing.
11        I want you to look at what we're going to
12  mark as Plaintiff's Exhibit No. 3.  Go ahead and
13  review that document.
14        (Exhibit No. 3 was marked for
15          identification and is attached
16          hereto.)
17  BY MS. ORTEGA:
18    Q    Does that appear to be the original account
19  opening documents for Greyside Group, Inc.?
20    A    I've never seen this form before.
21    Q    Okay.  Is it a Bank of America form?  Does
22  it say Bank of America at the top?  I guess let's
23  say that.
24    A    I've never seen it before.  Again, I've
25  been out the branches for several years; so this

Page 101

1  must be a new form.  I don't know the form.  It does
2  say Bank of America on the top left.
3    Q    And it's got a Greyside Group, Inc., under
4  business legal name.  And it at the top it says
5  required legal documentation checklist for business
6  accounts, and then it's got an account
7  No. 457006814610; correct?
8    A    Correct.
9    Q    And if you turn to Page No. 2, Plaintiff's
10  Exhibit No. 3 there's a certified copy of a
11  corporate resolution.  Do you recognize generally
12  this form?
13    A    It's, again, not the form that we use in
14  our group, but it appears to be.
15    Q    Okay.  On top of each page as you flip
16  through it, does it state 45700 -- a number
17  basically with 4610 written on all the pages?
18    A    Not on the third page.
19    Q    Okay.
20    A    And that is also a number that's written in
21  handwritten in.  Third page does not have that.  Is
22  it -- are you looking for me to verify the number?
23    Q    If you just review the document and we can
24  agree that on a majority of the pages there's that
25  4610 number; correct?

CHRISTINE SPINOGATTI

July 22, 2015

Page 102

1       MR. SHELY:  I'll object to the form.
2       **THE WITNESS:  Yes, it's a handwritten**
3  **number.**
4  BY MS. ORTEGA:
5       Q   Okay.  Now, if you turn to -- there's
6  numbers at the bottom.  There's No. 6.
7       **A   Uh-huh, yes.**
8       Q   Listed there is what is named articles of
9  incorporation; correct?
10      **A   Correct.**
11      Q   And the name of the corporation listed on
12  item -- line Item No. 1 is Greyside Group, Inc.;
13  correct?
14      **A   Correct.**
15      Q   And on line item No. 4 it states Alex
16  Popovic; correct?
17      **A   Correct.**
18      Q   Okay.  And then line item, and I know it's
19  a little blurry, if you go one, two, three, four,
20  five it says Alex Popovic and then what appears to
21  be a signature where it says "signature"?
22      **A   Okay.**
23      Q   Next to the name Alex Popovic?
24      **A   Okay.**
25      Q   I want you to look at six, page 6 of

Page 103

1  Exhibit No. 3 on there.
2       **A   Okay.**
3       Q   And tell me if you were to pull item
4  Plaintiff's Exhibit No. 1 and compare the signatures
5  on 1 to page 6 there on Exhibit No. 3 just.
6       **A   You're saying these two.**
7       Q   Yes.  When you're verifying the way
8  signatures appear do they look the same?
9       MR. SHELY:  Why don't you ask her if she
10  did pull it, and then it's a fair question.
11      **THE WITNESS:  And also ask me if I've ever**
12  **seen this form because I've never seen this form**
13  **before.**
14  BY MS. ORTEGA:
15      Q   Well, we spoke earlier about whether or not
16  pulling signatures would be a way to verify
17  identify; correct?
18      **A   So why wouldn't we be looking at another**
19  **signature card rather than a form I've never seen.**
20      Q   Okay.  I'll have you turn to Page No. 12 of
21  Plaintiff's Exhibit No. 3.
22      MR. SHELY:  I'm sorry?  Page No.
23      MS. ORTEGA:  12.
24      MR. SHELY:  Is that BANA 12 down at the
25  bottom?

Page 104

1       MS. ORTEGA:  BANA 12.
2       MR. SHELY:  Okay.
3  BY MS. ORTEGA:
4       Q   At the top there's a Bank of America
5  corporate signature card.
6       **A   This again I have never seen this document.**
7       Q   Okay.  When you look up -- you talk about
8  verifying signatures.
9       **A   Uh-huh.**
10      Q   On accounts.  The corporate signature cards
11  for each account are they -- you can pull them?
12      **A   You pull whatever the newest one.  You**
13  **cannot see things that are behind that.  On our**
14  **system it gives you the current signature card.**
15      Q   Okay.  It gives you only the current
16  signature cards?
17      **A   On the system that I have access to, the**
18  **current signature card.**
19      Q   Okay.  Now, so you've never seen this
20  document?
21      **A   I have never seen this document.**
22      Q   You didn't seek to verify the signature,
23  correct, from the account opening form?
24      **A   I don't know if I did or not, but I can**
25  **tell you I've never seen this form until right now.**

Page 105

1       Q   Okay.  Would you agree with me that the
2  signature line that is, and I know what your
3  testimony is, you've never seen the document?
4       **A   I've never seen this document.  I think to**
5  **ask me if that matches that's kind of irrelevant**
6  **isn't it if I've never seen this document?**
7       Q   Well, I'm asking you the questions, and
8  we'll deal with whether or not it's relevant, but
9  just in looking at these two forms on page 12 of
10  Exhibit 3 and page No. 1 of Plaintiff's 1 that
11  you're looking at now, do those signatures appear to
12  match?
13      **A   Okay.  Page No. 12 or Page No. 3?**
14      Q   Page No. 12, Plaintiff's Exhibit No. 3
15  which is that whole packet?
16      MR. SHELY:  You're in the right place.
17      **THE WITNESS:  Okay, no.  The signatures do**
18  **not appear to match.**
19      THE VIDEOGRAPHER:  Counsel, five minutes
20  left of tape.
21      MS. ORTEGA:  Okay.  Why don't I put a three
22  on there for you.
23      MR. SHELY:  So is this the original?  I
24  have somebody else's three.
25      MS. ORTEGA:  No, I put that three on there

CHRISTINE SPINOGATTI

July 22, 2015

Page 106

1  for you, Bob.
2      MR. SHELY:  Oh, you did put the three.
3      MS. ORTEGA:  I'm trying to keep you as
4  organized as I'm trying to keep myself.
5      MR. SHELY:  All right.
6  BY MS. ORTEGA:
7      Q   Do you know whether or not this KARC
8  account that we've been talking about was opened?
9  Based on your memory or your review of the documents
10  prior to today?
11     A   If it was opened?  I believe there was an
12  account opening, yes.
13     MS. ORTEGA:  Okay.  Let's see.  Tuesday.
14  Let me go through -- if you want to change your tape
15  now, and I'm going to switch to the next set of
16  documents.
17     MR. SHELY:  Why don't we just take lunch
18  because we're going to be here for a couple hours.
19     MS. ORTEGA:  Okay.  We can do that too.
20  I'm not very hungry.
21     THE VIDEOGRAPHER:  We are going off the
22  record.  The time is 12:05 p.m.  This ends video
23  disk No. 1.
24     (Lunch was taken from 12:05 p.m. to 12:51 p.m.)
25     THE VIDEOGRAPHER:  This begins video disk

Page 107

1  number two in the continuing deposition of Christine
2  Spinogatti.  The time is 12:51 p.m. on July 22,
3  2015.  We are back on the record.
4  BY MS. ORTEGA:
5      Q   Okay.  Christine.  Christine; right?
6  Ms. Spinogatti?
7      A   No, Christine is fine.
8      Q   I still feel uncomfortable.  So when we
9  last left off we were talking about a Kenton, we'll
10  call it KARC, that was opened and just slightly
11  review and tell me if I get anything wrong.  At some
12  point in time Oswald may or may not have asked you
13  to open the account, but through e-mails it appears
14  that Mr. Gowins was getting you the documentation
15  you were requesting; correct?
16     A   Correct.
17     MS. ORTEGA:  I'm going to show you what
18  we're going to mark as 4 and 5.  I'm going to have
19  her do all the marking.
20     MR. SHELY:  These are four and five?
21     MS. ORTEGA:  Yes, sir.
22     MR. SHELY:  Which is 4?
23     MS. ORTEGA:  She did four as the SS-4.
24     (Exhibit Nos. 4 and 5 were marked for
25     identification and are attached

Page 108

1      hereto.)
2  BY MS. ORTEGA:
3      Q   Okay.  Item No. 4 Plaintiff's Exhibit, does
4  that appear to be what you commonly refer to as an
5  SS-4 for the Kenton Associates Resources Corp.
6  Account?
7      A   Yes.
8      Q   And if you look on the second page there
9  the date of this notice 8/24/2011 does that
10  correspond with the dates that we've been talking
11  about thus far with regard to the Kenton account?
12     A   Yes.
13     Q   And I can give you the previous exhibit and
14  you can verify.  I don't want you to answer the
15  question if you're not sure.  Plaintiff's Exhibit
16  No. 1 and 2.
17     A   Yes.
18     Q   And previously in your e-mails you
19  requested that Mr. Gowins give you an SS-4; correct?
20     A   Correct.
21     Q   Is it safe to say that this is the form
22  that he gave you as disclosed by Bank of America?
23     A   It appears to be, yes.
24     Q   And if you look there on Plaintiff's
25  Exhibit No. 5 that is a Certification of

Page 109

1  Incorporation for Kenton Associates Resources
2  Corporation?
3      A   Yes.
4      Q   Okay.  And that's an incorporation in the
5  British Virgin Islands; correct?
6      A   That is what it says.
7      Q   Okay.  Is that a document that you would
8  require when opening a business account?
9      A   Yes.  Articles of Incorporation and an
10  SS-4.
11     Q   Okay.  Now, when receiving articles of
12  incorporation for opening a business account based
13  on your training and experience do you at all look
14  into the person who's trying to open the account,
15  their percentage interest in the company?
16     A   No.
17     Q   No.  Okay.  Now, you then take that
18  information and based on Mr. Gowins' request you
19  then entered it all into your system; correct?
20     A   Correct.
21     MS. ORTEGA:  I'm going to show you what
22  we're going to mark as 6.
23     (Exhibit No. 6 was marked for
24     identification and is attached
25     hereto.)

CHRISTINE SPINOGATTI

July 22, 2015

Page 110

1  BY MS. ORTEGA:
2    Q    Okay.  Now go ahead and read over
3  Plaintiff's Exhibit No. 6.
4    A    Okay.
5    Q    Plaintiff's Exhibit No. 6, does that appear
6  to be an e-mail with your name at the top from you
7  dated Tuesday, August 30, 2011, at 3:14, and the
8  subject is "Urgent Kenton Associates Resource Corp."
9    A    Correct.
10   Q    And that is to?
11   A    GFO-GFS Production Support.
12   Q    And who is that?
13   A    It's the back office.  It's the middle
14  office.  It goes to different places so.
15   Q    Okay, but you are responsible for rounding
16  up the documentation?
17   A    And sending it.
18   Q    And sending it in.
19   A    Uh-huh.
20   Q    In this e-mail it states I need the
21  following address to be updated on this GFO address
22  contact information.  What does that signify to you?
23  What does that mean?
24   A    That this is the correct address.
25   Q    Okay.  What does the acronym GFO stand for?

Page 111

1    A    I don't remember.
2    Q    You don't remember, or do you know what
3  it's referring to without maybe knowing the...
4    A    I don't remember.  It's been a year and a
5  half since I've been out of there; so I don't
6  remember.  It would be -- it would be generated from
7  the back office, one department from there, but I
8  don't know.
9    Q    Okay.  Not knowing what the acronym GFO
10  stands for, it appears you're asking for the address
11  for Kenton Associates to be updated a couple of days
12  before it's opened -- or after it's opened.  Excuse
13  me.
14   A    Uh-huh, yes.
15   Q    Okay.  And then you list this is a foreign
16  company established in the British Virgin Islands.
17  Well, was there some significance with pointing out
18  it was a foreign company based on your training and
19  experience?
20   A    No.
21   Q    Okay.  Is there a different know your
22  customer protocol that you would follow if it's a
23  foreign company?
24   A    I can't recall.
25   Q    You then say I need to open the account for

Page 112

1  them ASAP assuming as soon as possible?
2    A    Correct.
3    Q    Do you have a recollection of why this
4  account needed to be opened as soon as possible?
5    A    No, I don't, but it's not unusual to say
6  that.
7    Q    Okay.  You then correct the address that
8  appears to the British Virgin Islands address;
9  correct?
10   A    It appears that, yes.
11   Q    Does that British Virgin Island address
12  correspond with the address on the SS-4?  Is it the
13  same address?
14   A    No.
15   Q    And when you're looking at the SS-4, that's
16  Plaintiff's Exhibit No. 4; correct?
17   A    Yes.
18   Q    Now, I'm going to show you Plaintiff's
19  Exhibit No. 1 which is the deposit account
20  documentation signature card, page 3, for the Kenton
21  Associates Resource, KARC account.  That's the
22  account opening form.  Does that British Virgin
23  Islands address correspond with the address that's
24  listed?
25   A    The address for statement?

Page 113

1    Q    Yes.
2    A    No.
3    Q    So you have two different locations at this
4  point; correct?
5    A    Correct.
6    Q    Does that -- different locations on an
7  account when opening does that raise a red flag in
8  your training and experience?
9    A    No.
10   Q    Now, at the bottom line of Plaintiff's
11  Exhibit No. 6, "The address needs to be changed, and
12  it needs to be coded as a foreign entity.  Thank
13  you."  Remembering back, what is the significance of
14  coding the account as a foreign entity?
15   A    I don't know that that's my e-mail.  I
16  don't know that that's me typing that.
17   Q    Okay.
18   A    That's a different font, and that
19  doesn't -- I don't think that's me.
20   Q    You don't think that?  Okay.
21   A    I don't.
22   Q    And that's fair enough.  Do you know any
23  significance to KYC, and we're going to assume
24  that's know your customer, was updated?
25   A    Yes.

CHRISTINE SPINOGATTI

July 22, 2015

Page 114

1    Q    Would update that?
2    A    No. I would plug in the information, and
3    that's updated through the back office.
4    Q    Okay.
5    A    So that's -- I don't think that's me. I
6    don't know if there was other e-mail. I don't know.
7    Q    So let's look on -- listed here is page 367
8    BANA and page 368, there then appears to be a screen
9    capture.
10    A    Okay.
11    Q    Do you recognize what screen that is?
12    A    It's been a long time. Well, I think GFO
13    is their global fulfillment on line.
14    Q    Uh-huh.
15        MR. SHELY: The only question pending was
16    do you recognize the screen?
17        THE WITNESS: I don't. I don't.
18    BY MS. ORTEGA:
19    Q    Okay. Is this the screen that you would
20    use to enter the information in?
21    A    I don't think so.
22    Q    Okay. Fair enough. Listed on the business
23    entity registered address down there on the
24    left-hand corner that appears to be a 1260 -- I'm
25    not sure if that's 1 or a 4 World Gate Drive?

Page 115

1    A    Yes.
2    Q    And does that correspond with the address
3    on the statement and the SS-4 location?
4    A    Yes.
5    Q    Okay. Now, in between the page 1, the
6    second page in the screen shot on the third page
7    which is BANA 369, it then states, "Thank you.
8    Christine Spinogatti." And it has -- do you
9    recognize that as your signature line?
10    A    Yes.
11    Q    Okay. Is -- is GFO-GFS Production Support
12    that's the middle office that you're referencing?
13    A    Yes.
14    Q    Okay. Do you have any independent
15    recollection of this e-mail?
16    A    No.
17    Q    No. Okay. But it appears to be you asking
18    them to update the GFO address and contact
19    information; correct?
20    A    Correct.
21    Q    Now, when you originally opened this
22    account would you consider this to be a
23    non-face-to-face account opening?
24    A    That's how all of them are done in
25    business, yes.

Page 116

1    Q    In business banking they are?
2    A    Uh-huh.
3    Q    So is there any different monitoring
4    controls that you would follow based on your
5    training and experience for non-face-to-face
6    interactions?
7    A    No.
8    Q    There's no contact with the customer after
9    the account is opened?
10    A    Well, we send them the account number.
11    Q    You send it?
12    A    To the client.
13    Q    Okay.
14    A    Who's asking to open the account.
15    Q    And if you haven't met somebody face to
16    face, for example Alex Popovic, there is no request
17    for his signature to be notarized on there; correct?
18    A    Correct.
19    Q    And also, again, you never contacted him
20    after this account was opened utilizing his
21    information; correct?
22    A    Correct.
23        MS. ORTEGA: Okay. You can go ahead and
24    put all those together.
25        THE WITNESS: There's no 3, and I'm not

Page 117

1    responsible for it.
2        MS. ORTEGA: I think she's got the 3 there.
3        THE WITNESS: So should I give these to
4    you?
5        THE COURT REPORTER: That would be great.
6    BY MS. ORTEGA:
7    Q    Now, we had previously mentioned in our
8    discussion the Greyside Group account I think you
9    referenced; is that correct?
10    A    Correct.
11    Q    Do you remember -- do you have an
12    independent recollection of doing any work on the
13    Greyside Group, Inc., account?
14        MR. SHELY: Object to the form. You can
15    answer if you can.
16        THE WITNESS: I don't. I don't know what
17    you mean by "work."
18    BY MS. ORTEGA:
19    Q    And that's fair. Like I said, tell me if
20    you don't understand the question. When -- were you
21    contacted by Mr. Gowins to make any modifications to
22    the Greyside Group, Inc., account? Do you remember
23    independently?
24    A    Off the top of my head, no.
25    Q    No. Okay. Fair enough. I'm going to show

CHRISTINE SPINOGATTI

July 22, 2015

Page 118

1  you what we'll mark as what?
2      THE COURT REPORTER:  Seven.
3      (Exhibit No. 7 was marked for
4      identification and is attached
5      hereto.)
6  BY MS. ORTEGA:
7      Q   I'm going to show you what has been marked
8  as Exhibit 7.  What does that -- what does that
9  appear to be?
10     A   Signature card and adding a signor.
11     Q   And who's signature -- who's added to the
12  account based on that form?
13     A   Chris Gowins.
14     Q   And at the top of that form is that
15  Greyside Group, Inc., account?
16     A   Yes.
17     Q   And the account number has 4610 at the end?
18     MR. SHELY:  That's pretty hard to read.
19     THE WITNESS:  Yeah.
20  BY MS. ORTEGA:
21     Q   I know.  I only work with what I'm given,
22  but it says Greyside Group, Inc., at the top there?
23     A   Correct.
24     Q   Okay.  And that is based on your review of
25  the form and your training and experience, what does

Page 119

1  that form purport to do?
2      A   It is adding Chris Gowins to the account
3  and Alex authorized that by signing in this box.
4      Q   Okay.  And is Mr. Caulfield's name anywhere
5  on that form?
6      A   No.
7      Q   Now, did you accept that form or -- do you
8  remember accepting that form?
9      A   Again, if I was there I would have accepted
10  it.  If I was not, it could have been somebody else.
11     Q   Do -- did you personally get Alex Popovic's
12  signature?
13     A   No.
14     Q   What based on your training and experience
15  what identifying verification procedures would be
16  required to accept Alex's signature to add a person
17  to his account?
18     A   We -- procedures are that we would pull the
19  existing signature card and reference the signature,
20  compare the signature.
21     Q   Having never spoken with Alex directly?
22     A   Uh-huh, yes.
23     MS. ORTEGA:  I'm going to show you what
24  we're going to mark as Plaintiff's Exhibit No. 8.
25     (Exhibit No. 8 was marked for

Page 120

1      identification and is attached
2      hereto.)
3      MS. ORTEGA:  I need to see the number right
4  where your finger is.
5      Q   Can you look over at Plaintiff's Exhibit
6  No. 8 for me.  Tell me when you're ready?
7      A   Okay.
8      Q   This is an e-mail with your name at the top
9  of it; correct?
10     A   Correct.
11     Q   And it is authored from you or purports to
12  be sent Tuesday, September 20, 2011 at 9:35 a.m.; is
13  that correct?
14     A   Yes.
15     Q   And it's to Mohammed Mujeeb.  We'll just
16  say Mo.
17     A   Back office.  Okay.
18     Q   Is that somebody at the back office?
19     A   I would assume so.
20     MR. SHELY:  Don't assume.  If you know, you
21  know.
22     THE WITNESS:  Okay.  I don't know.
23  BY MS. ORTEGA:
24     Q   Do you know this person?
25     A   No.

Page 121

1      Q   No.  Okay.  Was this somebody that you
2  would send back office?
3      A   No.
4      Q   So in this e-mail it has several people
5  what we refer to as cc'd or carbon copied.  Do you
6  recognize any of those people other than yourself?
7      A   No.
8      Q   And the subject is regarding -- and it's a
9  response.  Signature card maintenance request;
10  correct?
11     A   Yes.
12     Q   Okay.  Does this e-mail -- well, is it
13  significant to you in any way?
14     MR. SHELY:  Object to the form.
15  BY MS. ORTEGA:
16     Q   I guess the subject line, does it indicate
17  that somebody had asked you for additional
18  information?
19     A   Not necessarily.
20     Q   Okay.  Well, let's go through it.  There's
21  a follow-up flag which is follow-up completed.  What
22  are those flags?  What does that mean?
23     MR. SHELY:  Where are you looking?  I'm
24  sorry.
25     MS. ORTEGA:  It's right below attachments.

Page 122

1   MR. SHELY:  Oh, I'm on the wrong page.  All
2   right.  Thank you.
3       THE WITNESS:  I think that's generated.  He
4   don't typically use those.  It's just an Outlook
5   thing that you put on there for follow-up.  So
6   perhaps when they sent it to me originally they put
7   the flag on it because I don't typically do that.
8   BY MS. ORTEGA:
9   Q   Okay.  So if you look at the second page of
10  that exhibit.  That is the original e-mail to you,
11  correct?  Or it appears to be?
12  A   Yes.
13  Q   Okay.  And it states, "Hi, Christine,"
14  directed at you, and it indicates client's name
15  Greyside Group, Inc., that client account No. 4610;
16  correct?
17  A   Correct.
18  Q   And it states, "We are currently unable to
19  process the signature card updates due to the
20  following one or more following reasons."  And then
21  it states agreement section of the signature card is
22  signed by Alex Popovic, CEO who is not among the
23  authorized signors on the resolution on file."  Do
24  you see that?
25  A   Yes.

Page 123

1   Q   Okay.  Have you received -- well, is this
2   e-mail asking for additional information from the
3   changes that you attempted to originally make?
4       MR. SHELY:  Object to the form.
5       MS. ORTEGA:  Yeah, that was terrible form.
6   Q   Is this an e-mail to you based on trying to
7   change or modify this account?
8   A   Yes.
9   Q   And you responded to that clearly?
10  A   Yes.
11  Q   Now, in your response on the first page it
12  says, "Hello, Mujeeb, with regard to the e-mail
13  below please find the attached resolution I pulled
14  from interact that reflects Alex Popovic as a signor
15  on the resolution.  Please advise on the next steps.
16  Thank you."  And then you include the resolution
17  card.  Now, you had previously testified that you
18  only pulled the first -- the last resolution card;
19  correct?
20  A   That's all that's available on interact,
21  yes.
22  Q   Are you able to access any of the signor
23  cards from before that?
24  A   No.
25  Q   Are you able to access them by calling the

Page 124

1   branch that the account was opened with?
2   A   No.
3   Q   Not at all?
4   A   Again, I don't even know that branches have
5   signature cards.  I don't think they have signature
6   cards anymore.
7   Q   Okay.
8   A   I --
9   Q   So you can't pull the original account
10  opening forms either?
11  A   No, not that I'm aware of.
12  Q   Okay.  So you provide the signature card.
13  This signature card purports on page 3 to be a
14  corporate resolution with Mr. Popovic and Mr. Rob
15  Caulfield; correct?
16  A   Correct.
17  Q   And then attached on page 4 is a signature
18  card, a corporate signature card with Mr. Popovic
19  and Mr. Rob Caulfield; correct?
20  A   Correct.
21  Q   So in the timeline Mr. Gowins comes to you
22  with a signature card purported to be signed by
23  Mr. Popovic adding Mr. Gowins to the account as a
24  signator?
25  A   Correct.

Page 125

1   Q   Signator; correct?
2   A   (No audible response.)
3   Q   And what is pulled in response to an
4   inquiry is a resolution with Mr. Caulfield and
5   Mr. Popovic; correct?
6   A   Correct.
7   Q   Mr. Gowins is not listed anywhere on the
8   items on Plaintiff's Exhibit No. 8 that you
9   referenced in response to this e-mail; correct?
10  A   That was a long question.  Can you say it
11  again.
12  Q   Absolutely.  The corporate signature card
13  resolution -- the resolution and corporate signature
14  card that you pull in response to the inquiry, does
15  that have Mr. Gowins' name anywhere on it?
16  A   No.
17  Q   And it only has Mr. Popovic's name?
18  A   Correct.
19  Q   And then the card authorizing Mr. Gowins
20  only has Mr. Popovic's name; correct?
21  A   It also has Chris's name.
22  Q   Well, authorizing Mr. Gowins?
23  A   Correct.
24  Q   Mr. Caulfield is not authorizing Mr. Gowins
25  on that signature card; correct?

CHRISTINE SPINOGATTI

July 22, 2015

Page 126

1   A   Correct.
2   Q   At any point in time did you contact
3   Mr. Popovic to determine if he executed that?
4   A   No.
5   Q   Do you remember if Mr. Gowins provided you
6   any identification verification from Mr. Popovic?
7   A   I don't recall.
8   Q   Okay. Would you have kept a copy of that?
9   A   I don't know.
10  Q   I'll go ahead and take those back. Okay.
11  I'll give you what we'll mark -- what we'll have her
12  mark...
13          MR. SHELY: What are we up to? Nine now?
14          THE COURT REPORTER: Yes.
15          (Exhibit No. 9 was marked for
16          identification and is attached
17          hereto.)
18  BY MS. ORTEGA:
19  Q   There you have an e-mail; correct?
20  A   Correct.
21  Q   Who is that e-mail from?
22  A   Chris Gowins.
23  Q   And who is it to?
24  A   Me.
25  Q   And what is the date on that e-mail?

Page 127

1   A   October 13, 2011.
2   Q   And what is the subject line there?
3   A   Assistance.
4   Q   In the beginning of that e-mail it appears
5   as though Mr. Gowins is referencing how frequently
6   he has contact with you; is that correct?
7   A   Yes.
8   Q   And can you read that line to me?
9   A   "Do you miss my multi-daily e-mails?"
10  Q   And then it appears to be what we now refer
11  to as the smiley winkey face I guess?
12  A   Okay, yeah.
13  Q   At this point in time on October 13, 2011
14  were you receiving multi-daily e-mails from Mr.
15  Gowins?
16  A   I don't know. I mean, there's -- I don't
17  know.
18  Q   Okay. Now, Mr. Gowins is asking in
19  assistance, and in his e-mail he requests, I'm
20  hoping -- well, "Hoping you can help me track down a
21  copy of a cashier's check issued in AZ branch by in
22  May."
23  A   Your Arizona branch.
24  Q   Uh-huh. So he's referring to a cashier's
25  check he wants you to pull a copy of. Does that

Page 128

1   seem accurate?
2   A   Yes.
3   Q   He then asks you, "In addition to this I
4   was wondering what type of credits are available to
5   offset items," and then he goes through some items.
6   A   That again is CashPro.
7   Q   Okay.
8   A   Treasury.
9   Q   Treasury.
10  A   Not -- yeah.
11  Q   It doesn't relate to you?
12  A   No.
13  Q   Now, the CashPro, do you remember if you
14  referred him to treasury?
15  A   Based on this?
16  Q   Uh-huh.
17  A   I don't -- I would think so, but I don't
18  recall.
19  Q   You don't recall?
20  A   Yeah.
21          MS. ORTEGA: Okay. I'm going to show you
22  an e-mail which we'll mark as Exhibit No. 10.
23          (Exhibit No. 10 was marked for
24          identification and is attached
25          hereto.)

Page 129

1   BY MS. ORTEGA:
2   Q   In this e-mail -- this is an e-mail with
3   your name at top; correct?
4   A   Are you looking at the first page?
5   Q   The first page, yes. I'm sorry.
6   A   Yes.
7   Q   And it's from Chris Gowins Trust Commerce
8   sent Monday, October 24, 2011?
9   A   Correct.
10  Q   And it's to you?
11  A   Correct.
12  Q   Okay. It's not to Oswald; correct?
13  A   Correct.
14  Q   Do you know whether or not Oswald was your
15  client manager at this time?
16  A   I don't remember when he left. I don't
17  recall.
18  Q   Okay. But the meeting that you met
19  Mr. Gowins for the first time --
20  A   It was Lee. It was Lee.
21  Q   Okay. He does not include anybody else on
22  this e-mail, but he includes "subject regarding
23  removal of access to accounts."
24  A   Okay.
25  Q   Correct?

CHRISTINE SPINOGATTI

July 22, 2015

Page 130

1     A   Correct.
2     Q   And it's got the flag that we talked about
3   earlier; correct?
4     A   Yes.
5     Q   Okay. If you turn to Page No. 3 or -- I'm
6   sorry. Go back. Turn to Page Number 2. Excuse me.
7     A   Okay.
8     Q   That is an e-mail from Mr. Gowins sent
9   Monday, October 24 which was before the e-mail on
10  page 1; correct?
11    A   Which was before the e-mail? Yes.
12    Q   Okay. So doing these in order, Mr. Gowins
13  sends an e-mail to you at 1:50 on Monday, October
14  24, 2011. He only sends that e-mail to you not
15  Oswald; correct?
16    A   Correct.
17    Q   And in the subject he says, "Removal of
18  access to accounts," and puts "importance high";
19  correct?
20    A   Yes.
21    Q   And in that he says, "Christine, please
22  keep this confidential at the moment, but we may
23  need to remove Alex Popovic's access to the account
24  and cancel his debit card. What forms might I need
25  to get this done? Also, will you need anything from

Page 131

1   the company board of directors notifying B of A of
2   the status change?" Does that fairly, accurately
3   represent what's contained in that e-mail?
4     A   Yes.
5     Q   Okay. And in response to that it appears
6   you respond quite quickly; correct?
7     A   Yes.
8     Q   Okay. And it states, "Hi, Chris, I'm on a
9   call at the moment. Can I call you to discuss?"
10    A   Yes.
11    Q   Okay. Do you remember or having -- do you
12  have an independent recollection of whether or not
13  you called him?
14    A   I don't.
15    Q   Okay. Do you remember closing the account?
16    A   Do I remember closing the account? From
17  what I have here it appears that I did close the
18  account. Do I distinctly remember back four years
19  ago? No.
20    Q   Okay.
21    A   I -- I, yeah.
22    Q   And that's fair enough. Based on your
23  training and experience, for this account what would
24  be needed to close the account, or I guess let me
25  take that a step back, to remove Alex and cancel his

Page 132

1   debit card?
2     A   That's not something that we typically did;
3   so I would have -- if that is what was going to
4   happen, I would have had to do some research.
5     Q   Okay. Do you remember doing research?
6     A   No.
7     Q   Okay. Based on your training and
8   experience do you need identification to close a
9   business entity account?
10    A   No.
11    Q   What is necessary based on your training
12  and experience?
13    A   A letter with the account number on it and
14  someone who's on the resolution needs to sign the
15  document that says "close the account."
16    Q   That's all that's needed?
17    A   Correct.
18        MS. ORTEGA: Okay. Now, from -- I'm going
19  to give you 11. Actually, that's my copy. She'll
20  give her that one.
21        MR. SHELY: What is this? 11; right?
22        MS. ORTEGA: Yeah.
23        (Exhibit No. 11 was marked for
24        identification and is attached
25        hereto.)

Page 133

1   BY MS. ORTEGA:
2     Q   Have you had a chance to review Plaintiff's
3   Exhibit No. 11?
4     A   Yes.
5     Q   This appears to be a Bank of America fax
6   cover sheet fax to you from you; correct?
7     A   I don't know why I would fax something from
8   me to me.
9     Q   No independent recollection?
10    A   It does look like it's -- I don't -- no,
11  definitely no recollection.
12    Q   And in this it's Bank of America -- at the
13  heading at the top it's Bank of America 10/26/2011,
14  October 26, 2011, 11:45 a.m., pages 1 of 3; correct?
15    A   Correct.
16    Q   Okay. And the second page which has the
17  same heading except for page 2 of 3, is that Kenton
18  Associates Resources Corp., August 29, 2011, deposit
19  account?
20    A   Correct.
21    Q   And then there's a third confidential page;
22  correct?
23    A   Correct.
24    Q   You don't have any independent recollection
25  of why you'd fax yourself a document?

Page 134

1    MR. SHELY: Object to the form.
2    THE WITNESS: No.
3    MS. ORTEGA: Show you 12.
4    (Exhibit No. 12 was marked for
5    identification and is attached
6    hereto.)
7  BY MS. ORTEGA:
8    Q   Okay. I'm showing you what's been marked
9  as Plaintiff's Exhibit No. 12. Go ahead and take a
10 second to review.
11   A   Okay.
12   Q   This document purports to be from Chris
13 Gowins at Trust Commerce sent on November 1, 2011 at
14 2:52 p.m.; correct?
15   A   Correct.
16   Q   And it's to you?
17   A   Correct.
18   Q   Okay. Oswald is not included on there?
19   A   Correct.
20   Q   And neither is Lee if he was the account
21 manager at the time; correct?
22   A   Correct.
23   Q   And in this it states, "Hey, Christine,
24 Alex went in and locked me out. The current funds
25 are minimal. What would be needed -- what would I

Page 135

1  need to close the account altogether?" And then he
2  suggests some account closing forms.
3    MR. SHELY: Object to the form.
4  BY MS. ORTEGA:
5    Q   Is that correct?
6    A   You're saying he says account closing
7  forms? I don't...
8    Q   "What would be needed to close the account
9  altogether?"
10   A   Altogether, question mark.
11   Q   Question mark.
12   A   Yes.
13   Q   And then he suggests, "A letter from the
14 board of directors and the sections of the operating
15 agreement providing them authority to act on behalf
16 of the company?"
17   A   Correct.
18   Q   Now, we just discussed the items that you
19 would need to close an account. Are those the items
20 contained within the e-mail from Mr. Gowins to you?
21   MR. SHELY: Which e-mail? Sorry.
22 BY MS. ORTEGA:
23   Q   Plaintiff's Exhibit No -- is there a 12 on
24 there?
25   A   Yes.

Page 136

1    Q   Okay. Do you need any of those documents
2  to close an account?
3    A   No.
4    Q   Do you remember if you responded to him?
5    A   I don't.
6    Q   Okay. In your position as support staff
7  for the client managers was it normal for you to
8  close accounts?
9    A   All the time.
10   Q   All the time. Okay. And would the account
11 manager also be notified that the account was being
12 closed?
13   A   It depended. It depends on the situation.
14 Sometimes people had multiple accounts and would
15 want to close out accounts.
16   Q   Okay. In a situation where there seems to
17 be some turmoil amongst members of a company, does
18 that raise any red flags?
19   A   Yes.
20   Q   And that's based on your training and
21 experience?
22   A   Yes.
23   Q   So because it raises red flags are there
24 any additional precautions based on your training
25 and experience that you would take?

Page 137

1    A   Yes. I would take it to management.
2    Q   Do you remember taking this to management?
3    A   This (indicating)? Yes.
4    MR. SHELY: When you say "this," let's --
5    THE WITNESS: Yes, okay.
6    MR. SHELY: What do you mean by "this"?
7  The document or the situation or what?
8    THE WITNESS: This document plus the
9  additional documents I took to management.
10   MR. SHELY: So "this document," you were
11 pointing to Exhibit 12.
12 BY MS. ORTEGA:
13   Q   Okay. So you took the e-mail or the
14 request, and it appears the document's reference to
15 management; is that correct?
16   A   Well, yes. This in addition to the closing
17 letter that he provided me with the additional
18 documents that I don't understand and that we don't
19 typically get, and I took it to management.
20   Q   Who did you take it to?
21   A   Ted Tragos.
22   Q   Do you know if Ted Tragos still works for
23 Bank of America?
24   A   He does.
25   Q   And do you see him frequently?

Page 138

1   A   Not since I walked out of that office a
2   year and a half ago.
3   Q   Did you regularly take issues to Ted?
4   A   Yes, if there was something I didn't
5   understand or if I had a question, absolutely.
6   Q   And just so I get a clear understanding of
7   who is who --
8   A   Okay.
9   Q   -- why would the issue be taken to Ted as
10  opposed to Oswald or Lee in their capacities?
11  A   Okay.  So I don't know if they were in the
12  office, if they were there or assigned at the time,
13  but I typically would go to the manager which he's
14  the market manager more than likely the highest
15  person that was there, and I took it to him.
16  Q   Okay.  What happened when you took it to
17  him?
18       MR. SHELY:  May I just make a request.
19  We're talking about it, and then she's made a
20  reference to another document.
21       MS. ORTEGA:  Fair enough.
22       MR. SHELY:  Would it be fair enough to put
23  that in front of her?
24       MS. ORTEGA:  Absolutely.
25       MR. SHELY:  Let me just take two-minutes

Page 139

1   here.
2        MS. ORTEGA:  And I did not mean to not put
3   that in front of her.  We just --
4        MR. SHELY:  I'd just like the record to be
5   clear.
6        MS. ORTEGA:  Of course.
7        MR. SHELY:  I'll be right back.
8        THE VIDEOGRAPHER:  Off the record, Counsel?
9        MS. ORTEGA:  Yes, please.
10       MR. SHELY:  Yes, please.
11       THE VIDEOGRAPHER:  We are going off the
12  record.  The time is 1:30 p.m.
13       (A brief recess was taken.)
14       THE VIDEOGRAPHER:  We are back on the
15  record.  The time is 1:33 p.m.
16  BY MS. ORTEGA:
17  Q   Okay.  Before we went off the record we
18  were talking about this and it; so let's clarify.
19  Mr. Gowins asked based on this e-mail to close the
20  account altogether, and when we are referring to the
21  account, we're talking about in the subject line
22  Greyside account 4610.  Is that your understanding?
23  A   Yes.
24  Q   Now, prior -- prior to asking to have that
25  account closed -- well, let's talk about that

Page 140

1   account first.  I withdraw that.
2        You went to your manager; correct?
3   A   Okay.  So can I have that?
4   Q   Yeah, I'll give it to you.  You went to
5   your manager; correct?
6   A   Once I received that (indicating) piece of
7   information --
8   Q   I'm going to show you what's been marked as
9   Plaintiff No. 13.  Is that that piece of information
10  you're referring to?
11  A   Yes.  A closure letter.
12       (Exhibit No. 13 was marked for
13       identification and is attached
14       hereto.)
15  BY MS. ORTEGA:
16  Q   What is that?
17  A   It's a letter requesting closure plus some
18  other information that is not something that I deal
19  with so I took this all to the market manager.
20  Q   Okay.  And that was?
21  A   Ted Tragos.
22  Q   Tragos.
23  A   Theodore, Theodore Tragos.
24  Q   Okay.
25  A   And showed him what I had and asked if I

Page 141

1   could close the account.  And he said that I could.
2   Q   Okay.  So let me be clear about what you
3   took to him.  Item No. 13 is what you're saying that
4   you took to him; correct?
5   A   Yes.
6   Q   Go ahead and review it because I don't
7   want --
8   A   I mean, this appears to be what the
9   documents were from my recollection and the e-mail
10  this looks correct.  Again, not anything that I
11  understand.  And then this letter.
12  Q   Okay.  So when talking about this letter,
13  we're talking about Plaintiff's Exhibit No. 13.
14  This is a letter that is authored specifically to
15  you; correct?
16  A   Correct.
17  Q   It's not authored to the client managers?
18  A   Correct.
19  Q   Just you?
20  A   Correct.
21  Q   And in the letter on Page No. 1 of
22  Plaintiff's Exhibit No. 13, first paragraph, "I am
23  writing to inform you that effective immediately the
24  Greyside board of directors have chosen to
25  temporarily suspend Alexsanda, (Alex) Popovic in his

CHRISTINE SPINOGATTI

July 22, 2015

Page 142

1 role as president and chief executive officer of
2 Greyside Global, LLC"; correct?
3    A   Yes.
4    Q   And this was a letter that was authored and
5 accepted in reference to the Greyside Group, Inc.,
6 account; correct?
7    A   Correct.
8    Q   Okay.  Did your manager Mr. Tragos ever ask
9 that you follow-up with Mr. Caulfield in regard to
10 this letter?
11   A   Follow-up?
12   Q   Well, did you call Mr. Caulfield after this
13 letter, or did you just accept it?
14   A   No, I did not call Mr. Caulfield.
15   Q   Okay.  Did Mr. Tragos tell you to contact
16 anybody?
17   A   I don't believe so; no.
18   Q   So you didn't contact anybody?
19   A   No.
20   Q   Did Mr. Tragos ask you for any board
21 meeting minutes?
22   A   No.
23   Q   Okay.
24   A   It was just what was enclosed in here.
25   Q   Okay.  So let's talk about what's enclosed

Page 143

1 in here.  Page 2 is an operating agreement excerpt
2 left blank; correct?
3    A   Yes.
4    Q   Okay.  And then Page No. 3 is labeled
5 Operating Agreement for Greyside Global, LLC;
6 correct?
7    A   Correct.
8    Q   Okay.  And the 4th page with BANA_POPOVIC
9 298 at the bottom is Page Number 21?
10   A   Correct.
11   Q   Okay.  And then the next page is page 22?
12   A   Correct.
13   Q   23?
14   A   Yes.
15   Q   24?
16   A   Yes.
17   Q   I.
18   A   If you can see that, then great.
19   Q   It appears to be, and then second II.
20   A   Okay.
21   Q   Correct?
22   A   Correct.
23   Q   And then another II?
24   A   Okay.
25   Q   Which is different than the preceding one;

Page 144

1 correct?
2    A   Correct.
3    Q   Okay.  And then after that is a general
4 assignment and bill of sale excerpt; correct?
5    A   Correct.
6    Q   And then there is a general assignment and
7 bill of sale, pages one, two, and then no page
8 number.  Do you remember -- is that a fair and
9 accurate representation of that exhibit?
10   A   Yes.  From what I recall it does look
11 correct.
12   Q   Okay.  You did not receive pages 1
13 through 20, did you?
14   A   I don't believe so.
15   Q   Okay.  You did not receive any board
16 meeting minutes appointing anybody to the board;
17 correct?
18   A   Correct.
19   Q   You did not receive any board company
20 resolutions; correct?
21   A   I did not really understand all of this so
22 when you're saying that I don't know what's in this.
23 I don't -- again, I don't typically look at this
24 stuff.  So as long as what you're saying is it
25 wasn't in here and it's not in here, then yes.  No,

Page 145

1 I didn't ask for anything additional besides what he
2 provided.
3    Q   And how was this provided to you?
4    A   I believe it was e-mail.
5    Q   Okay.
6    A   I don't remember.  I believe it was e-mail.
7    Q   Okay.  What -- when you went to Mr. Tragos
8 about this situation, what did you tell him?
9    A   I said, "Here's a letter that I received to
10 close the account.  Here are some documents I don't
11 understand.  What can we do?"
12   Q   And what did he tell you?
13   A   I don't remember the dialogue.  I'm fairly
14 certain that I would have printed up everything that
15 kind of went along with it and told him, you know,
16 had him look at this and it was determined that we
17 could close the account based on the portion of the
18 letter that has the full account number and Rob
19 being a signor on the resolution.
20   Q   Did he instruct you to contact Mr. Popovic?
21   A   No.
22       MR. SHELY:  I'm sorry.  When you say "he,"
23 you mean Mr. --
24       MS. ORTEGA:  Mr. Tragos.  I'm sorry.
25       THE WITNESS:  No.

CHRISTINE SPINOGATTI

July 22, 2015

Page 146

1  BY MS. ORTEGA:
2    Q    No. Okay. And did Mr. Tragos inform you
3  to contact Mr. Caulfield?
4    A    No.
5    Q    Aside from the meeting you had which I know
6  you don't remember the date, have you had any phone
7  conversations with Mr. Caulfield?
8    A    Since this?
9    Q    Yes.
10   A    No.
11   Q    Prior to this did you?
12   A    I don't -- I don't know that I ever -- I
13  met him that one time with the large meeting. I
14  don't know that I ever spoke with him on the phone.
15  I don't know. I can't remember, but certainly if I
16  did it may have been once. I don't remember.
17   Q    Okay. After you received this and you
18  closed the account, tell me what happens generally
19  when you close an account?
20   A    Again, you send it to the back office. You
21  send the letter. They look at everything. They
22  verify as I verified the signature, that that
23  person's on the resolution and they close out the
24  account.
25   Q    Okay. Now, this -- the e-mail that was

Page 147

1  authored?
2    A    This one?
3    Q    Plaintiff's Exhibit No. 12 is from
4  Mr. Gowins?
5    A    Correct.
6    Q    It was not from Mr. Caulfield?
7    A    Correct.
8    Q    And Mr. Gowins is providing you a letter
9  that is not authorized by him --
10        MR. SHELY: Authorized by who?
11  BY MS. ORTEGA:
12   Q    That is not signed by him. I'm sorry?
13   A    Not signed by Chris.
14   Q    Chris Gowins?
15   A    He's providing me a letter that is not
16  signed by Chris, yes.
17   Q    And up until this point Chris was added to
18  the account based on our previous exhibit by Alex;
19  correct?
20   A    Correct.
21   Q    And that's what the form purports to say?
22   A    Correct.
23   Q    But no one contacted Alex to determine if
24  Chris should have been added to the account?
25   A    That's correct.

Page 148

1    Q    Okay. Chris was added to the account, and
2  then Chris asked for the closure of the account as
3  well; correct?
4    A    Yes, but because Chris wasn't a signor on
5  the resolution we needed Rob to sign the letter.
6    Q    Now, prior to this, in all of this contact
7  that's been happening on this account since the end
8  of August to November Chris is your -- is it safe to
9  say he's your main point of contact?
10   A    Correct.
11   Q    Okay. And that is in regard to the
12  Greyside Group account?
13   A    Correct.
14   Q    Okay, but is it based on the forms that
15  we've been provided Chris is not added to the
16  account as a signor until September?
17   A    Okay. But was anything -- are you
18  questioning anything that was done previous to when
19  he was signed?
20   Q    Well, I'm asking you. That's the case;
21  correct?
22   A    He didn't do anything on the account until
23  he was a signor on the account.
24   Q    Okay. So Chris is doing all of the
25  activities on the account and yet you haven't spoken

Page 149

1  with Alex at all and you haven't spoken with Rob?
2    A    Correct.
3    Q    Now, Chris as well opens two more accounts
4  with you; correct?
5    A    What are the account names?
6    Q    Okay. Go ahead and give me those two
7  documents. I'm going to give them to her just so we
8  don't lose sight of them.
9    A    Okay. Oh, I'm sorry. Did you want them?
10        MS. ORTEGA: No. I want to make sure she
11  gets them. I'm going to show you an exhibit that's
12  been marked -- go ahead and give that to her -- as
13  Plaintiff's Exhibit No?
14        THE COURT REPORTER: 14.
15        MS. ORTEGA: 14.
16        (Exhibit No. 14 was marked for
17        identification and is attached
18        hereto.)
19        THE WITNESS: Okay. There's one --
20        MR. SHELY: Is there just one document
21  here?
22        THE WITNESS: Okay. There's one
23  additional.
24        MR. SHELY: We just have 431 or 432.
25  BY MS. ORTEGA:

CHRISTINE SPINOGATTI

July 22, 2015

Page 150

1   Q   Do you have 432?
2   A   Yes.
3       MR. SHELY:  Yeah, that's this document.
4   BY MS. ORTEGA:
5   Q   Oh, okay.  Good.  We all have the same
6   thing.
7       MR. SHELY:  Yeah, she had that extra page.
8       MS. ORTEGA:  Oh, I'm sorry.  I apologize.
9       THE WITNESS:  Yeah.
10      MS. ORTEGA:  Oh, the pages just stuck
11  together.
12      MR. SHELY:  Uh-huh.
13  BY MS. ORTEGA:
14  Q   Okay.  I'm showing you what's been marked
15  as Exhibit No. 14.  This is another deposit account
16  documentation signature card; correct?
17  A   Correct.
18  Q   And this is for Kenton Associates Resources
19  Corp.?
20  A   Correct.
21  Q   Now, this account the date on this form is
22  October 25, 2011; correct?
23  A   Correct.
24  Q   And it lists Mr. Robert -- well, Rob
25  Caulfield and Chris Gowins?

Page 151

1   A   Correct.
2   Q   Mr. Popovic is not listed anywhere on here?
3   A   No.
4   Q   Now, previously Kenton Resources account
5   had already been opened by you; correct?
6   A   Again, if I was there I would have opened
7   it, but if I wasn't, somebody else could have opened
8   it.
9   Q   I'm showing you what's been marked as
10  Exhibit No. 1.
11  A   Okay.
12  Q   Okay.  Are the tax ID numbers the same for
13  Kenton Resources on Exhibit No. 1 and Exhibit
14  No. 14?
15  A   Yes.
16  Q   Okay.  So effectively does that open two
17  separate accounts for Kenton?
18  A   Yes.
19  Q   Okay.  And, in fact, were two separate
20  accounts opened?
21  A   You have the account numbers.
22  Q   Okay.  And that's fair enough.  We can go
23  through them.
24      MR. SHELY:  If you don't know, you don't
25  know.

Page 152

1       THE WITNESS:  So it appears that, yes,
2   there's two different signature cards; so there
3   would be two different accounts.
4   BY MS. ORTEGA:
5   Q   Okay.  So based on the know-your-customer
6   standard is it a red flag when different persons,
7   different people open an account for the same
8   business?
9       (Cellular phone rings.)
10      MR. SHELY:  Sorry.
11      THE WITNESS:  That happens a lot based on
12  the type of account it is.  Some people are signors
13  on operating account, some people are signors on
14  investment accounts; so that's something that
15  happens a lot.
16  BY MS. ORTEGA:
17  Q   Okay.
18  A   If you've got a payroll account, you've got
19  additional people that are maybe administrative that
20  sign on the account versus other type of account;
21  so, no, it would not.
22  Q   Okay.  It would not raise a red flag?
23  A   No.
24  Q   So despite two separate people opening an
25  account it does not a red flag in the

Page 153

1   know-your-customer standard?
2   A   No, not in the case of business accounts.
3   Q   What about the addresses listed on those
4   separate accounts?  Are they the same address?
5   A   There's no address listed on this.
6   Q   You're referring to Plaintiff's Exhibit
7   No. 14?
8   A   14.
9   Q   Is there an address listed on Exhibit No.
10  1?
11  A   Yes.
12  Q   Okay.  Does that raise a red flag that
13  there's no address?
14  A   When an account is opened they would have
15  populated with an address.  I don't know why there's
16  no address there, but it wouldn't raise a red flag.
17      MR. SHELY:  Did you say would or would not
18  have?
19      THE WITNESS:  No, it would not have.
20  BY MS. ORTEGA:
21  Q   Okay.  When you say they would have
22  populated it, who are you referring to?
23  A   Back office.  When you're opening up an
24  account it gets -- I mean, there's obviously an
25  address associated with this.  I cannot answer why

CHRISTINE SPINOGATTI

July 22, 2015

Page 154

1 there's nothing here. I don't know why.
2   Q   Did you accept that document?
3   A   I don't recall.
4       MS. ORTEGA: Okay. Mark that.
5       THE COURT REPORTER: Exhibit 15.
6       (Exhibit No. 15 was marked for
7       identification and is attached
8       hereto.)
9 BY MS. ORTEGA:
10  Q   Go ahead and look at Exhibit No. 15.
11  A   Okay.
12  Q   Does it appear that you opened that second
13 account?
14  A   Yes.
15  Q   So Exhibit No. 15 is an e-mail from you
16 Christine Spinogatti from Amith Goswamy.
17  A   Correct.
18  Q   Do you know who that is?
19  A   No.
20      MR. SHELY: Am I looking at the right thing
21 here? I've got a different one for 15.
22      THE WITNESS: Yeah, you do.
23      MR. SHELY: I have BANA 383, and she has
24 BANA 380.
25      MS. ORTEGA: We have the right one. You do

Page 155

1 not have the right one. Here you go. Sorry about
2 that. One ahead of me.
3       MR. SHELY: So this is 15; correct?
4       MS. ORTEGA: Yes.
5       MR. SHELY: All right.
6 BY MS. ORTEGA:
7   Q   Okay. Now, Exhibit No. 15, based on that
8 exhibit does it indicate that you opened the second
9 Kenton Associates account?
10  A   It appears to be, yes.
11  Q   So when you refer to "they would have
12 populated it," would you have followed -- do you
13 remember opening the account? Let's start there.
14  A   No, I don't.
15  Q   If you opened the account, would you have
16 entered the information into your system as you had
17 talked about earlier?
18  A   Yes.
19  Q   Okay. So when entering the information in
20 the system would it have been you that entered the
21 address?
22  A   I'm really racking my brain to remember
23 what exactly we put in there; so I don't -- I don't
24 remember exactly what information we populated. I
25 haven't opened up a new account in over a year and a

Page 156

1 half.
2   Q   Would there be a reason that the form's not
3 filled out completely with the address?
4   A   No.
5   Q   Okay. Is that unusual?
6   A   No, not necessarily.
7   Q   It's not unusual to have forms incomplete?
8       MR. SHELY: Well, you haven't established
9 what's on the form; so I object to the form of the
10 question.
11      THE WITNESS: I know. I mean, do we know
12 is this pulled off of the system, or is this pulled
13 off an e-mail?
14 BY MS. ORTEGA:
15  Q   Okay. So let's go through the forms. You
16 have a deposit account agreement in front of you
17 which is Item No. 14; correct?
18  A   Correct.
19  Q   And in that deposit account agreement
20 there's a date at the top October 25, 2011; correct?
21  A   Correct.
22  Q   And it's a deposit account documentation
23 signature card; correct?
24  A   Correct.
25  Q   And the organization legal name is Kenton

Page 157

1 Associates Resources Corp; correct?
2   A   Correct.
3   Q   And it's descriptive account is KARC
4 operating; correct?
5   A   Correct.
6   Q   Which is the same as the description on
7 Exhibit No. 1; correct?
8   A   Correct.
9   Q   Okay. And at the bottom of that box
10 address for statement there's an address listed on
11 Exhibit No. 1, but not an address listed on Exhibit
12 No. 14; correct?
13  A   Correct.
14  Q   Okay. When we were talking about earlier
15 the items that were needed to open an account you
16 indicated a deposit account documentation signature
17 card?
18  A   Resolution signature card.
19  Q   Okay. So this is one of the two documents
20 necessary to open an account; correct?
21  A   Yes.
22  Q   That document Exhibit No. 14 is missing an
23 address; correct?
24  A   Yes.
25  Q   Given that it's one of two documents

CHRISTINE SPINOGATTI

July 22, 2015

Page 158

1  necessary to open an account is it odd that there's
2  no address listed?
3      A   It's one of four documents.
4      Q   Fair enough.
5      A   You need Articles of Incorporation and
6  SS-4.
7      Q   Okay.
8      A   And, again, I guess what my question is is
9  this -- if -- was this pulled off of the system?
10  Because if this was what was given to us and then it
11  was updated because that was left off, as you can
12  well imagine this is a very confusing form and
13  clients would many times not fill out things, even
14  tax ID Numbers and whatever else. So if your point
15  is there's no address, on the actual form that's on
16  our system the address might be there.
17      Q   Okay. I'm going to object to that being
18  nonresponsive and ask you just very simply.
19      A   Okay.
20      Q   This form here I have in front of you --
21      A   Yes.
22      Q   -- if it's provided to you to open an
23  account and the address is missing --
24      A   Yes.
25      Q   -- is that an irregularity? Should that

Page 159

1  address be filled out?
2      A   Yes.
3      Q   Would you accept that and continue to open
4  the account with no address?
5      A   I would get the address.
6      Q   Okay. So within your system there should
7  be a form with the address filled out; correct?
8      A   I would assume so, yes.
9      Q   Now, based on your training and experience,
10  what address should that be?
11      A   I don't know.
12      Q   Should it be an address that matches the
13  SS-4?
14      A   An address for statement, a lot of times
15  placed are established and ABC Accounting Firm is
16  balancing their books; so the statement actually
17  goes to ABC Accounting Firm. So this is just the
18  address for statement.
19      Q   Correct.
20      A   So it could go to a different location.
21      Q   Okay. So the address -- the address then
22  is input into your system that you input should be
23  the same address as on the SS-4; correct?
24      A   On one portion of it. On the know your
25  customer portion of it, and I don't recall exactly

Page 160

1  if there's two sections of addresses when we're
2  plugging in this information for the back office.
3  But even the back office once they receive this and
4  they don't see that there's something written here
5  for the statement, they would then ask that
6  question.
7      Q   To you?
8      A   Yes.
9      Q   Okay. But when you input a customer isn't
10  it -- didn't we discuss earlier it's your job to
11  collect all this information --
12      A   Correct.
13      Q   -- based on your training and experience?
14      A   Correct.
15      Q   If an address is missing --
16      A   It should be -- the address for statement
17  should be filled out, correct.
18      Q   You previously testified that it is not
19  irregular for two accounts to be opened for the same
20  business for the same entity with different signors?
21      A   Uh-huh, yes.
22      Q   Okay. That happens frequently?
23      A   Yes.
24      Q   Okay. It happens frequently within a month
25  and a half?

Page 161

1      A   Sometimes there's multiple accounts and
2  people -- like I said, there's payroll account with
3  different signors, there's operating accounts with
4  different signors, there are different accounts with
5  different signors.
6      Q   Fair enough. Generally when you open
7  multiple accounts for one entity do they have a
8  different descriptive account title?
9          MR. SHELY: Object to the form.
10         THE WITNESS: Many times that's blank.
11  That's just -- that is not titling on the account.
12  That is just as reference on the system. So
13  this -- you could put -- like I said, you could put
14  payroll account. You could put operating account.
15  BY MS. ORTEGA:
16      Q   Okay. So based on your training and
17  experience did two accounts coming through with the
18  exact same tax ID number with the same name and
19  different address information and different signor
20  information raise any red flags to you?
21         MR. SHELY: Object to the form.
22         THE WITNESS: No, not at the time.
23  BY MS. ORTEGA:
24      Q   Okay. Now that you're looking at the
25  documents does it?

CHRISTINE SPINOGATTI

July 22, 2015

Page 162

1    A   Again, as I stated many times you have
2   multiple signors, different signors on different
3   accounts that are the same.
4        MS. ORTEGA: I'm going to object to
5   nonresponsive.
6        MR. SHELY: It wasn't nonresponsive. She
7   was answering the question.
8   BY MS. ORTEGA:
9    Q   No. Now, that you're looking at the
10  document does it raise red flags? Yes or no based
11  on your training and experience?
12   A   Looking at these documents, no.
13       Do you want those back? Is that 16? This
14  is 15, 14 and 1. No 16.
15  BY MS. ORTEGA:
16   Q   Now, I'm showing you what's been marked as
17  Exhibit 383. Go ahead and take a second to review
18  it.
19   A   Okay.
20       (Exhibit No. 16 was marked for
21       identification and is attached
22       hereto.)
23  BY MS. ORTEGA:
24   Q   That's from Batool Raheem on Tuesday,
25  November 8, 2011; correct?

Page 163

1    A   Correct.
2    Q   And that's to you?
3    A   Correct.
4    Q   And the subject line says "GFS account
5   closing request. Client name Kenton Associates
6   Resources Corp." And then it goes on with some
7   numbers. I can list them out if you like?
8    A   No need.
9    Q   Okay. In this document it states, "Hi,
10  your request is processed and account is closed.
11  Please refer to the following details below. List
12  the Kenton Associates Recourse Corp with the account
13  No. 8417." Correct?
14   A   Correct.
15   Q   Do you remember asking for the Kenton
16  Resources Corp account to be closed?
17   A   Not specifically.
18   Q   Okay. Do you remember who asked you to
19  close it?
20   A   No. There should be a letter.
21   Q   Okay. So you closed this account in
22  response to a letter; correct? Is that your
23  recollection?
24   A   It's not my recollection. It's just the
25  course of business of how it's done.

Page 164

1        MS. ORTEGA: Okay. I'm going to show
2   you -- so we can do them altogether, 16, as I said.
3   17, 18, and 19.
4        (Exhibit Nos. 17, 18, & 19 were
5        marked for identification and are
6        attached hereto.)
7        MR. SHELY: Are you done with 16?
8        MS. ORTEGA: Yeah. We'll come back to it
9   though.
10       MR. SHELY: We're going to come back to it?
11       MS. ORTEGA: Yeah.
12       THE WITNESS: So are we --
13       MS. ORTEGA: Go ahead and move that aside,
14  but keep it all in one pile.
15       MR. SHELY: This is -- what is -- I'm mixed
16  up here so I'll just catch up. This has been marked
17  as 17. This one, okay. So that's the one I have
18  17. Let me make sure.
19       MS. ORTEGA: Yeah, let me make sure that I
20  get them because I got in trouble one time. I
21  thought that would be easier.
22       MR. SHELY: Well, I have 17 and 18 and she
23  has a 19 that I don't have. Thank you.
24       MS. ORTEGA: Now, No. 19 there -- Bob, can
25  you give me the Bates stamp number.

Page 165

1        MR. SHELY: On 19?
2        MS. ORTEGA: Yes.
3        MR. SHELY: 389.
4        MS. ORTEGA: 389. Thank you.
5   BY MS. ORTEGA:
6    Q   So I'm showing you what's been marked as
7   Exhibit No. 17, 18, and 19. Okay. I want you to
8   start out with No. 17.
9    A   Okay.
10   Q   Is that a deposit account documentation
11  form to open a new account?
12   A   Correct.
13   Q   And that's opened October 25, 2011?
14   A   Correct.
15   Q   And that's for the Kenton Associates
16  Resources Corp?
17   A   No, it's Greyside Global.
18   Q   Oh, Greyside Global. I'm sorry. I had the
19  wrong document.
20       MR. SHELY: I'm sorry. I'm lost. We're on
21  18 right now?
22       THE WITNESS: 17, and it's Greyside Global.
23  Oh, no. His is Kenton.
24       MR. SHELY: Mine says Kenton. That's why
25  I'm confused.

Page 166

1    THE WITNESS: Mine says Greyside.
2        MS. ORTEGA: What's the number down there
3  at the bottom?
4        THE WITNESS: There is no number.
5        MS. ORTEGA: If we can go off the record.
6        MR. SHELY: Yeah.
7        MS. ORTEGA: I'm just going to get
8  organized because we've been flying through these
9  documents.
10       THE VIDEOGRAPHER: We are going off the
11  record. The time is 2:03 p.m.
12       (A brief recess was taken.)
13       THE VIDEOGRAPHER: We are back on the
14  record. The time is 2:10 p.m.
15  BY MS. ORTEGA:
16   Q   Previously I had you looking at Plaintiff's
17  Exhibit 17, 18, and 19 collectively. To avoid any
18  confusion we'll keep them all separate. I want to
19  you took at Item No. 17.
20   A   Okay.
21   Q   Okay. What do you recognize that document
22  to be?
23   A   It's the banking resolution.
24   Q   For what organization?
25   A   Greyside Global, LLC.

Page 167

1    Q   And what's the date on there?
2    A   October 25, 2000 -- and is that a 1 or is
3  that '13?
4    Q   I'll have you look at Item No. 18. What is
5  that?
6    A   Is that the same? That says October 25,
7  2011.
8    Q   2011. Is that a larger copy of page
9  number --
10   A   I'm just looking to see if it's -- yes, it
11  looks like it's the same.
12       MR. SHELY: These are two different
13  documents.
14       THE WITNESS: The second page -- the third
15  page.
16       MR. SHELY: Oh, I'm sorry.
17       THE WITNESS: So the third page, the
18  signature card to the signature card.
19  BY MS. ORTEGA:
20   Q   And I just -- I got two separate copies; so
21  I just wanted to make sure those appear to be the
22  same based on your review of the documents?
23       MR. SHELY: That's what I'm saying the
24  third page of Exhibit 17 is different than the first
25  page of 17. Am I missing something?

Page 168

1        MS. ORTEGA: It's the third page is the
2  same as Exhibit No --
3        MR. SHELY: 18. Okay. That I agree with.
4  BY MS. ORTEGA:
5    Q   So we all agree the third page of I'm Item
6  No. 17 is a smaller copy of Exhibit No. 18; correct?
7    A   Yes, it appears to be.
8    Q   Okay. And that document combined with Page
9  Number 1 of Exhibit 16 -- or Exhibit 17 does
10  that open -- effectively open a new account for
11  Greyside Global, LLC?
12   A   With the articles and the SS-4, yes.
13   Q   Okay. And that's a new account that's open
14  with an address of Irvine Center Drive in Irvine,
15  California. It appears to be a nine, and my copy
16  looks like a blotch?
17   A   Maybe 92618. Yes, that's the address for
18  the statement.
19   Q   Okay. Now, the signors on this account are
20  Rob Caulfield and Chris Gowins as board of directors
21  chairman and CFO respectively; correct?
22   A   Correct.
23   Q   Okay. Do you have an independent
24  recollection of opening that account?
25   A   No.

Page 169

1    Q   Okay. I'm going to have you look at Item
2  No. 19. Is that an e-mail to you?
3    A   Yes.
4    Q   And that's confirming that this Greyside
5  Global, LLC account was opened at your request;
6  correct?
7    A   Correct.
8    Q   Okay. Now, so far the documents we've
9  reviewed, we've reviewed four accounts three of
10  which were opened by you. Is that a good synopsis?
11   A   Yes.
12   Q   Okay. Now, do you remember if Mr. Gowins
13  or Mr. Caulfield came in -- saw you personally to
14  open this account?
15   A   They did not.
16   Q   Do you know at this point if it was
17  requested by a client manager?
18   A   I don't recall.
19   Q   You don't recall. Okay. Now, both the
20  second Kenton account which is --
21   A   Here.
22   Q   The subject of Plaintiff's Exhibit 14, 15,
23  and 16 was opened at or about the same time as the
24  Greyside Global, LLC account; correct?
25   A   It appears to be, yes.

CHRISTINE SPINOGATTI

July 22, 2015

Page 170

1    Q   And what do you base that opinion on?
2    A   The date on the signature card says
3   October 25, 2011, and that's the same that we have
4   on this signature card.
5        MR. SHELY:  So if you'd be kind enough to
6   refer to Exhibit Nos. that you're talking about.
7        THE WITNESS:  Oh, so Exhibit 14, the date
8   on Exhibit 14 matches the date on Exhibit 18.
9   BY MS. ORTEGA:
10   Q   Okay.  Now, that date also -- those two
11   accounts were opened following -- well, the day
12   after Mr. Gowins authored an e-mail to you which is
13   in Plaintiff's Exhibit No. 10 asking that Alex be
14   suspended or removed from the accounts; correct?
15   A   He said it may.  "I may need to do that."
16   He didn't do that.
17   Q   Okay.  What did he do based on your review
18   of the documents?
19   A   Close the account.
20   Q   Okay.  Did you bring -- when you went and
21   talked to Mr. Tragos?
22   A   Tragos.
23   Q   Tragos, did you bring all this
24   documentation to him or just the documentation as it
25   related to the LLC?

Page 171

1    A   I would have taken all of the information
2   just because that's how I would typically.  I don't
3   recall.  I know 100 percent I took that whole
4   packet, but I'm sure I took the other individual
5   pieces as well.
6    Q   So did you take all four accounts to
7   Mr. Tragos or just the Greyside Global, LLC account?
8    A   Okay.  So when I received that e-mail, that
9   e-mail (indicating).
10       MR. SHELY:  Which is what?  You have to
11   identify it by Exhibit Nos.
12       THE WITNESS:  Exhibit 13, when I received
13   this, I took this.
14   BY MS. ORTEGA:
15   Q   Exhibit No. 13?
16   A   13.
17   Q   Which is the account closure.
18   A   The account closure letter, and then all of
19   those following documents to Mr. Tragos.  That was
20   done on November 1, and what you're asking me is did
21   I take Exhibit 10 to him as well?
22   Q   Well, let me clarify.  You took Exhibit No.
23   13 to him.  When you went to Mr. Tragos about the
24   issue with the account closure and 13, did you tell
25   him at that point that Mr. Caulfield and/or Mr.

Page 172

1   Gowins had opened two new accounts as well?
2    A   I don't recall.
3    Q   Okay.  Did you tell him that -- well, did
4   you provide him -- let me take that back.  Let me
5   withdraw.
6        When you went to him do you recall if you
7   had brought him any of the signator cards for the
8   other three accounts?
9    A   I don't recall.
10   Q   Okay.  Did you -- do you remember if you
11   discussed any account other than the account
12   referenced in Item No. 13?
13   A   I don't recall.
14   Q   Okay.  Now, Item No. 13 asks -- makes a
15   request that -- let's see.  The third paragraph, "At
16   this time I request the account 457006814610 be
17   closed"; correct?
18   A   Correct.
19   Q   However, what the first paragraph says is
20   that Mr. Popovic had been suspended as chief
21   executive officer of Greyside Global, LLC; correct?
22   A   Yes.
23   Q   Do you know what account the 4610 account
24   corresponds with?
25   A   Group.

Page 173

1    Q   Okay.  Was the LLC account closed at the
2   same time?
3    A   When we look to a letter, we look at the
4   full account number and whether or not that person's
5   a signor on the resolution.  So again, this -- I
6   didn't know what to do with that.  I took it to him.
7    Q   Okay.
8    A   And I didn't consider much of this myself.
9    Q   Okay.  Did he ask you to provide --
10   Mr. Tragos -- I'm sorry -- did he ask you to provide
11   him any other documentation?  Do you remember?
12   A   I wish I did.  I wish I did.
13   Q   Fair enough.  So you cannot remember
14   whether or not you brought additional documentation?
15   A   I -- I -- I feel as though I would have
16   most certainly brought him at least this
17   (indicating).
18   Q   And "this" is your --
19       MR. SHELY:  When you say "this," what is
20   this?
21       THE WITNESS:  Document 10, Exhibit 10.
22   BY MS. ORTEGA:
23   Q   Okay.  And why do you feel like you would
24   have brought him Exhibit No. 10?
25   A   Whatever pertaining to the account to this

CHRISTINE SPINOGATTI

July 22, 2015

Page 174

1 closure I -- I -- I mean, I'm going to him for his
2 advice and his expertise; so I feel that I would
3 have taken that, but I don't really recall.
4     Q   Okay. I'm going to show you --
5         THE COURT REPORTER: Exhibit 20.
6         (Exhibit No. 20 was marked for
7         identification and is attached
8         hereto.)
9         MS. ORTEGA: Go ahead and -- why don't we
10 put them in order so then that way if we have to
11 reference them.
12        MR. SHELY: Are you finished now you think
13 with Exhibit Nos. 17, 18, 19?
14        MS. ORTEGA: Yes.
15    Q   All right. You're looking at Item No. 20
16 now.
17    A   Correct.
18    Q   Plaintiff's Exhibit No. 20. Does this
19 letter appear to be the same letter on the first
20 page of Item Number 13 with the exception of some
21 handwritten notes?
22    A   Yes.
23    Q   Okay. Do you recognize whose handwriting
24 that is?
25    A   Yes, that's my writing.

Page 175

1    Q   So this is your writing?
2    A   Correct.
3    Q   On top of Exhibit Number 13?
4    A   Correct.
5    Q   The first -- well, one, two, three, the
6 third paragraph which is the first handwritten line
7 has a Greyside Group, LLC, and then it appears to be
8 numbers. Do you remember what that notation
9 signified when you wrote it at the time you wrote
10 it?
11    A   The title of the account I would assume.
12    Q   The title of the Greyside Group, LLC?
13    A   The title of the account that corresponds
14 with the account number that's listed there. It's
15 right next to the account number.
16    Q   Okay. So let's look at that account
17 number. Okay. I'm going to show you what we
18 previously went through as Exhibit No. 3. Okay.
19 Exhibit No. 3 I know that you said you don't
20 recognize --
21    A   No.
22    Q   -- those documents as you didn't open them;
23 correct?
24    A   Not that I didn't open them. I've never
25 seen these documents because I don't work in a

Page 176

1 banking center.
2    Q   Okay. So that being said do you dispute
3 that they're Bank of America documents?
4    A   It says Bank of America. It's our logo;
5 so, yes, I would assume it's Bank of America documents.
6    Q   So I'm going to have you turn to the last
7 page of Exhibit No. 3. Go ahead and -- the second
8 to the last.
9    A   This is --
10    Q   Yeah, I know I said that but...
11        MR. SHELY: Why don't you give her a Bates
12 No. on that one, Christine.
13        THE WITNESS: 13.
14 BY MS. ORTEGA:
15    Q   13?
16        MR. SHELY: Just the page you're looking
17 at.
18 BY MS. ORTEGA:
19    Q   Okay. You're looking at Bates No. 13 on
20 there?
21    A   13.
22        MR. SHELY: 13. Okay.
23        THE WITNESS: She gave me three.
24        MR. SHELY: That's fine. I didn't quickly
25 adjust here so quick.

Page 177

1 BY MS. ORTEGA:
2    Q   Now, based on Exhibit No. 3 are you able to
3 determine what Bank of America account number
4 Greyside Group, Inc., is?
5    A   I would assume it's the account number
6 that's listed on top.
7    Q   So that's 457006814610; correct?
8    A   Correct.
9    Q   If you go to the letter that has your
10 handwritten notes on it?
11    A   Yes.
12    Q   Number 20. Does that match the account
13 No. 457006814610 on the third paragraph?
14        (Cellular phone rings.)
15        MR. SHELY: Sorry.
16        THE WITNESS: It's okay. I'm sorry?
17 BY MS. ORTEGA:
18    Q   I guess what I'd like you to do is review
19 the documentation. Having Exhibit No. 3 can you
20 tell whether the Greyside Group, Inc., account is
21 the account with the 4610 ending?
22    A   Yes.
23    Q   Or the Greyside Global, LLC account?
24    A   No, it's the Greyside Group.
25    Q   Okay. So in this letter what is being

CHRISTINE SPINOGATTI

July 22, 2015

Page 178

1  requested of you is to close the Greyside Group,
2  Inc., account; correct?
3      A  Yes. I mean -- yes, he's giving me the
4  account number, correct.
5      Q  And in your notations next to that you
6  reference the Greyside Group, LLC account; correct?
7      A  Correct.
8      Q  Do you remember why you made a notation of
9  a different account than the account number?
10     A  Then the account number? You mean this
11  number that I wrote?
12     Q  Yes.
13     A  That -- no. I mean, it could be any
14  number.
15     Q  Okay. In this first paragraph this letter
16  refers to Mr. Popovic in his role as president and
17  chief executive officer of Greyside Global being
18  temporarily suspended; correct?
19     A  Yes.
20     Q  And then in the third paragraph it asks you
21  to close the account with regard to Greyside Group,
22  Inc.; correct?
23     A  Greyside Group? You're saying in the
24  second paragraph it says Greyside Group.
25     Q  Okay. Let's starts -- the third paragraph

Page 179

1  which has the account number, what account number
2  does that -- what account does that number
3  correspond with?
4      A  Greyside Group.
5      Q  Greyside Group, Inc.
6      A  Yeah. I mean, this says "Inc." If you --
7  do you have a bank document that says Inc., like a
8  statement that would say Inc.?
9      Q  Sure.
10         THE COURT REPORTER: Do you want 21 and 22?
11         MS. ORTEGA: 21 and 22.
12         (Exhibit Nos. 21 & 22 were marked for
13         identification and are attached
14         hereto.)
15  BY MS. ORTEGA:
16     Q  So I'm going to show you what we're going
17  to mark as 21 and 22.
18     A  Okay.
19     Q  The 461 account that's referenced in this
20  November 1 closure letter is the Greyside Group,
21  Inc., account asking that specific account
22  number be closed; correct?
23     A  Correct.
24     Q  Next to that third paragraph is your
25  handwriting that says Greyside Group, LLC?

Page 180

1      A  Correct.
2      Q  Is the Greyside Group, LLC account a
3  different account than the group account?
4      A  I have no idea.
5      Q  Okay. I want you to look at Exhibit
6  Number 21 and 22.
7      A  Okay. So it is LLC.
8      Q  Okay. Exhibit No. 21, do those appear to
9  be bank statements for Greyside Group, Inc.?
10     A  Yes.
11     Q  With an account number of?
12     A  4610.
13     Q  Is that the same account number that's
14  referenced in the closure letter?
15     A  Correct.
16     Q  I'm going to have you look at Exhibit
17  Number 22. Is that a Greyside Global, LLC account?
18     A  Correct.
19     Q  Is that account number different than the
20  number in Item No. 20?
21     A  Yes.
22     Q  Okay. And Greyside, the notations next to
23  that account number Greyside Group, LLC --
24     A  Correct.
25     Q  -- has the same name as Plaintiff's Exhibit

Page 181

1  No. 22; correct?
2         MR. SHELY: Object to the form. One says
3  Greyside Group; One says Greyside Global.
4  BY MS. ORTEGA:
5      Q  Okay. Let me be very clear. Are you
6  referencing -- well, do you remember if you're
7  referencing the LLC or the Inc., account?
8      A  I -- I don't remember. I scribbled
9  something on a piece of paper. I don't recall what
10  I scribbled.
11     Q  Okay. Now, the first paragraph, I want to
12  go back to the first paragraph. Based on the
13  statement, "I'm writing to inform you that effective
14  immediately the Greyside board of directors have
15  chosen to temporarily suspend Alexsanda (Alex)
16  Popovic in his role as president and chief executive
17  officer of Greyside Global, LLC." Okay. Does that
18  statement Greyside Global, LLC and Mr. Popovic's
19  name correspond with the name at the top of item --
20  Plaintiff's Exhibit No. 21?
21     A  No.
22     Q  Okay. Now, the account number on the third
23  paragraph down does that account number correspond
24  with Plaintiff's Exhibit No. 21?
25     A  Does that account number correspond with

CHRISTINE SPINOGATTI

July 22, 2015

Page 182

1  21? Yes.
2  Q  Okay.  Based on the first paragraph
3  referencing Greyside Global, LLC and the third
4  paragraph referencing the account number and
5  Greyside Group, Inc., do you remember if Mr. Tragos
6  asked you to go clarify with Mr. Caulfield which
7  account he was talking about?
8  A  No.  We have a full account number.  We're
9  looking at the full account number and we're looking
10  at the signature.
11  Q  Okay.  And next to the full account number
12  is a mixture, for lack of a better word, of Greyside
13  Group, LLC with is a mixture of Greyside Group,
14  Inc., and Greyside Global, LLC; correct?
15  A  Correct, which I'm sure was done not when I
16  handed this to him.  I'm sure I gave it to him in
17  its entirety printed Exhibit 13 without any of my
18  scribbles on it.
19  Q  Okay.
20  A  That's just my scribble that...
21  Q  Okay.  So let's talk more about your
22  scribble.  Item No. 20, there's more writing that's
23  somewhat unrecognizable as to what it says.  Is it
24  your handwriting?
25  A  Yes.

Page 183

1  Q  And it appears to say Greyside Global?
2  A  It appears, yes.
3  Q  And below it is what could be a C; correct?
4  And a number $77.61; correct?
5  A  Correct.
6  Q  And then there's a No. 4570, and then some
7  numbers that are -- they appear to be light -- too
8  light that the photocopy couldn't copy them;
9  correct?
10  A  Correct.
11  Q  But I want you to look at the two last
12  numbers.  Okay.  The two last numbers does that
13  appear to be a 1 and a 0, or does it appear to be a
14  0 and a 2?
15  A  I don't know.
16  Q  Does it appear to be a 4570?
17  A  Do you have a better copy than me because I
18  don't see that?
19  Q  The --
20  A  Oh, you're saying at the beginning.  I'm
21  sorry.  We were talking about the end.
22  Q  I'm sorry.
23  A  Okay.  Yes, the beginning does say 4570,
24  and then to me it's unreadable.
25  Q  Unreadable.  Okay.  The last two numbers,

Page 184

1  does the last number appear to be a 0 written by
2  you?
3  A  The last number, this number (indicating)?
4  Q  The last number on the third does that
5  appear to be a 0?
6  A  No.
7  Q  Does that appear to be a two?
8  A  I don't know.
9  Q  Okay.  Now, the last number of the Greyside
10  Global, LLC account is that a 2?
11  A  Yes.
12  Q  Okay.  The last number of the Greyside
13  Group, Inc., account is a 0?
14  A  Correct.
15  Q  And the third line on your handwritten
16  notes is definitely not a 0?
17  A  No.
18  Q  Okay.  We'll put all those together.
19  MR. SHELY:  Are we done with these?
20  MS. ORTEGA:  Yes.  Do you need a break?
21  THE WITNESS:  No, I'm fine.
22  MS. ORTEGA:  You're okay.  Okay.  Bob, do
23  you need a break?
24  MR. SHELY:  Let's take two minutes.  I
25  mean, I'm not holding you to it, I'm just curious

Page 185

1  for afternoon purposes what do you think you've got
2  left to go?
3  MS. ORTEGA:  15 minutes.
4  MR. SHELY:  Okay.  So half an hour.
5  MS. ORTEGA:  Only if I follow your style.
6  MR. SHELY:  I know.  That's what I'm
7  saying.  Christine, you can stay or walk.
8  THE VIDEOGRAPHER:  We are going off the
9  record.  The time is 2:34 p.m.
10  (A brief recess was taken.)
11  THE VIDEOGRAPHER:  We are back on the
12  record.  The time is 2:41 p.m.
13  BY MS. ORTEGA:
14  Q  Okay.  We left off you had reviewed the
15  account closure request made in Plaintiff's Exhibit
16  No. 13 as you recall with your manager; correct?
17  A  I'm sorry.  Say that again.
18  Q  You had reviewed the account closure
19  request in Plaintiff's Exhibit No. 13 with your
20  manager last we left off; correct?
21  A  Correct.
22  Q  Okay.  Do you remember if he asked you to
23  do any follow-up with the customer after that?
24  A  If he asked me to do anything, I would have
25  done it.  I don't recall him asking me to do